Filed 7/29/24  Magasinn v. Rafalian CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| MICHAEL L. MAGASINN as Trustee, etc.,<br><br>     Plaintiff, Cross-defendant and Respondent,<br><br>     v.<br><br>BEHNAM RAFALIAN,<br><br>     Defendant, Plaintiff, Cross-complainant and Appellant.<br><br>SHAHRAM ELYASZADEH et al.,<br><br>     Defendants, Cross-defendants and Respondents. | B324627<br><br>(Los Angeles County Super. Ct. Nos. TC029184 and 19STCV06801) |

APPEAL from the judgment of the Superior Court of Los Angeles County, Maurice A. Leiter, Gary Y. Tanaka, Kristin S. Escalante, and Thomas D. Long, Judges.  Affirmed in part, reversed in part.

Cox, Castle & Nicholson, Kenneth B. Bley and Jacob N. Segura for Defendant, Plaintiff, Cross-complainant and Appellant.

The Leichter Firm, Kevin J. Leichter and Andrew E. Hewitt for Plaintiff, Cross-defendant and Respondent Michael L. Magasinn as Trustee, etc.

Affeld England & Johnson, David W. Affeld and Brian R. England for Defendants, Cross-defendants and Respondents Shahram Elyaszadeh and Yona Samih.

_____

Behnam Rafalian appeals from the judgment entered against him in the lawsuit filed by David Azizi as the former trustee (Trustee) for the Shamsam Irrevocable Trust (Trust). The Trustee asserted six causes of action against Rafalian for breach of fiduciary duty, accounting, conversion, declaratory relief, fraudulent transfer, and quiet title. The Trustee sought to enforce a 2006 judgment Shahram Elyaszadeh (Ely)[1] obtained

_____

[1] Elyaszadeh refers to himself as Sean Ely. Ely and Yona Samih are correctly identified as respondents to this appeal because the judgment encompassed both the Trustee's action against Rafalian and Rafalian's action against Ely, former trustees Azizi and Shahram Ravaie, current trustee Michael L. Magasinn, and Samih, which was consolidated with the Trustee's action. Although E&E Mortgage Bankers Corp., E.L.Y. Mortgage Bankers Corp., 26 Malibu L.L.C., E&B Funding Group, LLC, PCH USA 26, LLC, Yona Investment Group, LLC, Lion Solar, LLC, Nice Team, LLC, Sunrise Financial LLC, Agoura Hills Financial, LLC, and Stonehaven, LLC are identified as respondents in Ely and Samih's respondents' brief, these

2

against Rafalian, which required Rafalian to transfer his 50 percent ownership interest in a commercial property in Carson to Ely.

On appeal, Rafalian challenges the validity of the Trust, the Trustee's standing to enforce the 2006 judgment, the trial court's exclusion of evidence concerning the alleged illegality of the Trust, and Ely's partial assignment of the 2006 judgment to the Trustee. Rafalian also contends the monetary award was excessive and the trial court abused its discretion in denying his motion for new trial based on the excessive damages. Rafalian also argues the trial court erred in awarding prejudgment interest on the damages award from the end of the trial through entry of judgment. We reverse the award of prejudgment interest, but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *The* Haeim *Action and the 2006 Judgment*

On April 29, 2005 Ray Haeim and Rafalian filed a complaint in *Haeim v. Ely* (Super. Ct. L.A. County, 2005, No. SC085372) (*Haeim* action) against Ely arising from a dispute over their ownership interests in a shopping mall located in Elko, Nevada, for which Ely's limited liability company held sole title. (*Haeim v. Ely* (June 10, 2008, B196355) [nonpub. opn.].) Ely filed a cross-complaint seeking an ownership interest in four other properties, including a commercial property located in Carson, California on which was located a large retail store. After a jury

_____

business entities do not have appellate standing because they are not parties to either action.

3

trial on Ely's cross-claims, the jury returned a special verdict finding (1) Rafalian and Ely entered into an oral agreement for Ely to invest $5 million in exchange for a 50 percent ownership interest in the five properties; (2) Ely and Rafalian were partners or joint venturers; (3) Rafalian breached the oral agreement; (4) Ely suffered damages in the amount of $475,000; and (5) Rafalian was unjustly enriched, but in the amount of zero dollars.  Following a court trial on Ely's equitable claims, the trial court agreed with the jury's finding that there was a joint venture/partnership to acquire all five properties, including the Carson Property.  (*Ibid.*)

On December 26, 2006 the trial court entered an amended judgment (2006 Judgment) that provided as to Ely's fifth cause of action:  "IT IS FURTHER ADJUDGED AND DECREED that, as to the fifth cause of action in Ely's cross-complaint for an accounting, judgment be entered in favor of Ely and against Rafalian, entitling Ely to: (i) full access to all books and records regarding the Carson Property, with Rafalian ordered to provide full access to those books and records, through Shaoul Levy or otherwise; and (ii) a full accounting of all income and expenses for the Carson Property since 2003, and full annual accountings of all future income and expenses for the Carson Property until such time as the Carson Property is sold and/or Ely receives his 50% ownership interest or a distribution representing same . . . ."

The judgment provided as to Ely's sixth cause of action: "IT IS FURTHER ADJUDGED AND DECREED that, as to the sixth cause of action in Ely's cross-complaint for declaratory relief, judgment be entered in favor of Ely and against [Haeim] and Rafalian, declaring that (i) Ely has a 50% ownership interest in the Carson Property; (ii) [Haeim] does not have any ownership

4

interest in the Carson Property or in Ely's 50% ownership interest in the Carson Property; (iii) a constructive trust be imposed on Rafalian's ownership interest in the Carson Property, declaring Rafalian the constructive trustee of Ely's 50% ownership interest in the Carson Property with the accompanying utmost and highest duties imposed by law of loyalty and trust to Ely, to take care of and protect Ely's 50% ownership interest in the Carson Property, to deliver Ely's 50% ownership interest in the Carson Property to him as soon as possible, and to account for Ely's 50% ownership interest in the Carson Property."

Rafalian appealed from the judgment, and we affirmed. (*Haeim v. Ely, supra*, B196355.)

B.     *Ely's Assignment of Judgment to the Trustee*

On March 6, 2012 Ely filed an acknowledgement of assignment of judgment (Assignment) in the *Haeim* action. The Assignment stated, "Ely acknowledges that he assigned to Shahram Ravaie,[2] as Trustee of the Shamsam Irrevocable Trust dated February 29, 2012 his entire right, title and interest in the judgment on Ely's sixth cause of action for declaratory relief, namely this Court's declaration that: (1) Ely has a 50% ownership interest in the Carson Property; (ii) [Haeim] does not have any ownership interest in the Carson Property or in Ely's 50% ownership interest in the Carson Property; (iii) a constructive trust be imposed on Rafalian's ownership interest in the Carson Property, declaring Rafalian the constructive trustee

---

[2]     The initial trustee was Ravaie, who was succeeded by Azizi, who was then succeeded by Magasinn. We refer generally to each of the successive trustees as the "Trustee."

5

of Ely's 50% ownership interest in the Carson Property with the accompanying utmost and highest duties imposed by law of loyalty and trust to Ely, to take care of an[d] protect Ely's 50% ownership interest in the Carson Property, to deliver Ely's 50% ownership interest in the Carson Property to him as soon as possible, and to account for Ely's 50% ownership interest in the Carson Property."[3]

C. *The Trustee's Complaint and Agreement with Shaoul Levy[4]*

On June 20, 2018 Azizi, as trustee of the Trust, filed a verified complaint against Rafalian, 500 Carson Town Center L.P. (LP), 500 Carson Town Center LLC (LLC), and Western Alliance Bank. (*Azizi v. Rafalian* (Super. Ct. L.A. County, 2018, No. TC029184.)[5] The complaint asserted causes of action for breach of fiduciary duty, accounting, conversion, declaratory relief, fraudulent transfer, and quiet title.

On June 26, 2018 the Trust entered into an agreement with Levy as the managing member of the LLC. In exchange for dismissal of the LP, LLC, and Western Alliance Bank from the action and dismissal of the quiet title cause of action without prejudice, Levy agreed "to convey to the Shamsam Trust a 40% interest in each of the LLC and the LP" or "cause the LP to convey an undivided 40% fee interest in the Property to

---

[3] The Assignment was served by mail on Rafalian's attorney of record.

[4] Levy became the managing member of the LLC in July 2017; Rafalian was the prior managing member.

[5] On February 2, 2021 the trial court granted successor trustee Magasinn's request to substitute for Azizi as the plaintiff in the Trustee's action.

6

Shamsam Trust" once construction and financing on the Carson Property was completed. The Trust acknowledged that the "10% share is in dispute; the Trust has to file a lawsuit for it." The Trust further acknowledged "that Shaoul Levy and his affiliates have provided material value to the Company, and the Property, and agrees that when the project is sold or refinanced, the highest priority payment after secured debt will be any advance made by Shaoul Levy or any of his affiliates, plus 20% per annum. Second priority is a payment of $4,000,000 to Shaoul Levy or assignee, for the financing, construction, leasing and personal recourse guarantees provided for the benefit of the Property."

On October 26, 2018 Rafalian filed a verified answer in which he denied the allegations in the Trustee's complaint. Rafalian asserted 12 affirmative defenses, including that the Trustee lacked standing, the causes of action were barred by the statute of limitations, and the Trust and Assignment were illegal.

D.    *Rafalian's Cross-complaint and the Trustee's Demurrers*

On October 26, 2018 Rafalian filed a cross-complaint against Azizi and Ravaie, individually and as trustees of the Trust. Rafalian alleged he was a creditor of Ely, Ely was insolvent, and Ely's assignment of the 2006 judgment to the Trust was a fraudulent conveyance and transfer of property.

The Trustee filed a demurrer, which the trial court sustained with leave to amend.[6] On March 14, 2019 Rafalian

---

[6]    Judge Maurice A. Leiter entered the order sustaining the demurrer, finding the Uniform Fraudulent Transfer Act's four-year statute of limitations barred Rafalian's fraudulent transfer

filed his first amended cross-complaint against Ely individually, and Azizi and Ravaie individually and as trustees, alleging causes of action for fraudulent transfer and declaratory relief. Rafalian attached and incorporated by reference a February 2019 complaint he had filed against Ely and the Trustee for fraudulent transfer and declaratory relief in *Rafalian v. Elyaszadeh* (Super. Ct. L.A. County, 2019, No. 19STCV06801). The February 2019 complaint alleged Rafalian had acquired by assignment a civil judgment against Ely entered on November 25, 2009 in *Goldman v. Elyaszadeh* (Super. Ct. L.A. County, 2009, No. BC411539; Goldman judgment). Further, the complaint alleged that he became a judgment creditor of Ely based on the assignment of the Goldman judgment, and he therefore had the right to challenge the validity of the Trust and the 2012 Assignment.

On August 19, 2019 the trial court[7] sustained the Trustee's demurrer to the first amended cross-complaint without leave to amend. The court ruled the causes of action for fraudulent transfer and declaratory relief based on the 2012 Assignment were barred by the seven-year statute of limitations (Civ. Code, § 3439.09, subd. (c)). Further, the cause of action for declaratory relief with respect to the 2006 Judgment was barred by issue preclusion. On October 15, 2019 Rafalian appealed the order sustaining the demurrer. On July 16, 2020 we dismissed the appeal "as having been taken from a non-appealable order."

---

claim because Rafalian should have learned of the transfer at the time the Assignment was filed in the *Haeim* action, and Rafalian could not state a claim for common law fraudulent conveyance because he failed to allege he had a judgment against Ely or the Trust.

[7]     Judge Gary Y. Tanaka.

E.    *The Motions for Judgment on the Pleadings*

On November 20, 2020 Rafalian moved for judgment on the pleadings on the Trustee's complaint, arguing the Assignment was an invalid partial assignment of the 2006 Judgment because it only pertained to the sixth cause of action in Ely's cross-complaint in the *Haeim* action. Therefore, Rafalian argued, the partial assignment did not confer legal standing on the Trustee to enforce the 2006 judgment against Rafalian. In opposition, the Trustee argued the Assignment was not invalid, and even if it was, Rafalian ratified it.

On December 17, 2020 the trial court[8] denied Rafalian's motion for judgment on the pleadings, finding the Assignment was not a partial assignment because "Ely assigned his entire right, title, and interest" in the sixth cause of action for declaratory relief to the Trustee. The Trustee therefore had standing to enforce his rights under the Assignment.

On April 19, 2021 the Trustee moved for judgment on the pleadings as to Rafalian's seventh affirmative defense based on the 10-year statute of limitations to enforce a judgment under Code of Civil Procedure section 337.5, subdivision (b). The Trustee argued the statute of limitations did not bar the action because the complaint was filed two months before the statutory period expired.[9] On May 11, 2021 the trial court granted the

---

[8]    Judge Leiter.

[9]    Further undesignated statutory references are to the Code of Civil Procedure.

9

motion, finding the Trustee's action was not barred under section 337.5.[10]

F.      *The Court Trial*

The trial court[11] conducted an 11-day bench trial from February 15 to March 4, 2022. Rafalian testified that in 2004 the LP acquired the CRICKM Carson Trust, which owned the Carson Property. At the time of the purchase, the Carson Property was encumbered by a $20 million loan (prior loan) secured by a deed of trust. Rafalian owned 79.2 percent of the LP. Rafalian also owned 80 percent of the LLC, which was the general partner and owner of 1 percent of the LP. Rafalian testified he could not transfer an interest in the CRICKM Carson Trust to Ely because it would constitute a default on the loan secured by the deed of trust and allow the lender to foreclose on the Carson Property.

From 2004 to 2016, the tenant on the Carson Property, Kmart, paid the debt and tax obligations of the property. But in January 2017 Kmart ceased making lease payments. On January 9, 2017 the lender notified CRICKM Carson Trust that it had not received the January 2017 loan payment. Levy forwarded the email to Rafalian and Ely and stated, "We are fucked." On January 13 Ely responded by email, writing in part: "[U]nfortunately I have been very much concerned and perplexed

---

[10]     Judge Kristin S. Escalante ruled on the motion. The trial court also found Rafalian's February 2019 complaint filed in LASC case No. 19STCV06801 was related to the Trustee's June 20, 2018 complaint filed in LASC case No. TC029184. The court designated the Trustee's action as the lead case and Rafalian's action as the consolidated case.

[11]     Judge Thomas D. Long.

10

with [Rafalian's] position refusing to relinquish my fifty percent ownership in Carson Kmart. . . . [A]s you indicated he has every intention to damage my fifty percent interest by not cooperating closely to save the property from its current situation." Rafalian replied in part, "I already gave your 50% of my share to you [a] long time ago and I have no control of your share." On August 10, 2017 Ely again emailed Rafalian (with a copy to Levy), stating in part: "As you have been informed 50% ownership on Carson Kmart property was transferred to my children's trust in Feb of 2012. [¶] As I have indicated to you many times in the past few years regarding the current state of 50% ownership that belongs to my children's trust that needs to be transferred by you." Rafalian testified he received the email, but "maybe [he] didn't read it." On August 10, 2017 Ely's attorney emailed Rafalian to demand "transfer of the interest that [Rafalian] ha[d] been holding in trust per the judgment."

On July 1, 2017 the LP agreement was amended to reduce Rafalian's interest from 79.2 to 9.9 percent and to add three limited partners: Levy (49.5 percent interest), Rafalian's wife Roya (9.9 percent interest), and Rafalian's son Kevin (9.9 percent interest). On the same day, the LLC operating agreement was amended to reduce Rafalian's 80 percent interest to 10 percent, and to add Levy (50 percent interest), Roya (10 percent interest), and Kevin (10 percent interest) as members of the LLC. Rafalian testified Levy's interest in the LP was held for the benefit of the prevailing party in this action. Levy confirmed he held the LP and LLC interests "in trust for whichever side [won] this lawsuit."

On October 26, 2017 Rafalian, as administrative trustee of CRICKM Carson Trust, conveyed the Carson Property to the LP

11

by grant deed.  On October 27, 2017 the LP borrowed from Western Alliance Bank $21,575,000 as a construction loan (construction loan), secured by a deed of trust on the Carson Property that was recorded on November 30, 2017.  At the time of the construction loan, the balance on the prior loan was $7,984,607;[12] however, with the addition of a defeasance fee, the total loan payoff was $10,211,870.[13]  Levy testified the construction loan was used to pay off the prior loan on the property and the defeasance fee, and to pay for tenant improvements on the Carson Property.[14]  Rafalian's attorney asked, "So aside from those three uses, there were no other recipients of the proceeds of the Western Alliance Bank loan; is that correct?"  Levy answered, "Let me make it clear. Mr. Rafalian did not take any money from this property.  He doesn't even have signatory I don't believe.  I don't think he ever signed a check.  No money at all went to Mr. Rafalian, zero, zip."  Levy further testified the reconstruction project "went over budget substantially and [he] had to go borrow on Mr. Rafalian's property and take the money from him in order to continue

---

[12]     We round the dollar amounts for ease of reference, except where included in a quotation.

[13]     Levy testified the LP needed to pay a "defeasance fee" to pay off the loan amount early because the investors were guaranteed a certain rate of return for a specific time period.

[14]     Levy testified he contacted Kmart after his son advised him that Kmart might "go out of business."  Kmart paid a $2 million cancellation fee to terminate its lease, which Levy sent to the lender.  Levy "[s]imultaneously" obtained "a construction loan in order to not be in default of [the] existing loan" and to bring in new tenants.

finishing the project." According to Levy, Rafalian loaned about $1.2 or $1.25 million for the project, and Levy "put it in the Carson Property." Levy had yet to repay Rafalian's loan.

In December 2019 the LP obtained a $26,250,000 loan from Wells Fargo Bank, which was secured by a deed of trust recorded on December 26, 2019. Levy testified the Wells Fargo Bank loan was used to refinance the construction loan and to pay Levy a portion of his $4 million service fee. Rafalian testified he did not agree to pay Levy a service fee of $4 million; "[t]hat was what Shaoul Levy and Sean Ely agreed." Levy denied any Wells Fargo Bank loan proceeds went to Rafalian.

According to the Trustee's expert real estate appraiser, Paul Russell, "the as-is market value" of the Carson Property as of February 13, 2022 was $50,870,000. Rafalian's expert, John Luna, testified that he performed a business appraisal of the LP. Luna admitted he did not have the experience or education to conduct a real estate appraisal.

G.     *The Statement of Decision*

Following the court trial, on June 17, 2022 the trial court issued its statement of decision.[15] The court found Rafalian owed a fiduciary duty to the Trustee as a constructive trustee under the 2006 Judgment. Rafalian was liable for breach of fiduciary duty and conversion because he never conveyed the 50 percent interest in the Carson Property to the Trustee. The court found the Trustee suffered harm because "he was deprived of his 50% interest in real property valued on the date of trial at

---

[15]     Before issuing the statement of decision, the trial court considered Rafalian's objections to the tentative statement of decision and argument at a June 17, 2022 hearing.

$50,870,000." The court found the testimony as to the value of the Carson Property "was uncontested," and Russell, the Trustee's expert appraiser, was "qualified as an expert, credible and reliable." Further, Rafalian's expert (Luna) was not qualified to opine on the value of the Carson Property, and his "testimony was not credible and not relevant and therefore of no weight."

In addition, the trial court found the Trustee was entitled to an accounting under the 2006 Judgment, but not to lost profits. The court explained "the accounting prove[d] that no balance is due to Plaintiff because Defendant [Rafalian] proved that, with Plaintiff's acquiescence, he reinvested all profits from the Carson Property back into the Property in a manner that increased the value of the Property." The court also found the Trustee had "proven his entitlement to declaratory relief determining that [he] owns 49.5% of the LP and 50% of the LLC (the LLC owns 1% of the LP) and to have those interests conveyed to him." The court added, "Both [Rafalian] and Levy testified that it was disputed whether Plaintiff should receive interests in the LP and LLC, despite agreeing that this Court could decide that very question and that they both would comply with whatever the Court decided to do. . . . Therefore, the Court has the authority to order . . . Mr. Levy to transfer the interests in the LP and LLC being held by him to Plaintiff as he agreed to do on the record before the Court and to do so in a manner that gives Plaintiff a 50% beneficial interest in the Carson Property."[16]

---

[16] The trial court found with respect to the Trustee's fraudulent transfer cause of action that "Rafalian did not transfer interests relating to the Property with the intent of placing them out of the reach of Plaintiff. Indeed, Rafalian and Levy made

14

The trial court ordered that the Trustee could choose between two remedies: (1) 50 percent interests in the LP and LLC or (2) monetary damages. The court explained the Trustee proved the property value was $50,870,000. With respect to Rafalian's entitlement to deductions from the property value, the court found, "The proof of the value of the Carson Property and its appreciation over time demonstrates that the principal prior loan balance paid off on November 30, 2017 [by the construction loan], of $7,984,607.44 through refinancing with Western Alliance Bank (aka Torrey Pines Bank) was reasonable as Plaintiff agrees. The Court also finds that the defeasance amounts paid as part of the 2017 refinancing were required by the loan terms and were customary and reasonable yielding a total payoff amount on November 30, 2017, of $10,211,869.69. The balance of the refinancing principal amount of $21,575,000 . . . funded the redevelopment of the Carson Property that allowed the owners to replace the prior sole tenant KMART, which had gone bankrupt, with other tenants that helped restore the Carson Property's value as evidenced by the appraisal of the Carson Property put into evidence by Plaintiff. But the specific amounts of the 2017 refinancing used for these purposes and their reasonableness has not been proven. Similarly, the further

---

information about the Carson Property readily available to Plaintiff and Ely on their request. Instead, the Court concludes that interests were transferred to Levy so that they would be held pending the outcome of this litigation. The Court finds that the transfers of interests relating to the Property made previously were simply made to facilitate refinancing and redevelopment of the Carson Property and not to conceal those interests from Plaintiff."

15

refinancing of the Carson Property with Wells Fargo Bank on December 26, 2019, was for $26,250,000 . . . and some of the increased encumbrance was used for tenant improvements but the specific amounts so used and their reasonableness remain unproven.  Accordingly, the only offset Defendant has met his burden to prove is the principal amount and defeasance fees of the 2017 Western Alliance Bank refinancing of $10,211,869.69."

The trial court continued, "The $4,000,000 fee pledged to Levy is not a proper offset in the calculation of money damages against Rafalian.  Rafalian argues that the agreement contained in Exhibit 157 reflects Plaintiff's acceptance of all expenses incurred by the LP.  However, there is no evidence in the record establishing the reasonableness of these expenses to the satisfaction of the Court.  Moreover, Exhibit 157 is an agreement between Plaintiff and Levy as to how the obligations of the LP will be addressed if and when Plaintiff obtains an interest in the LP.  The agreement does not include Rafalian as a party, nor does he appear to be a third-party beneficiary to the agreement.  Accordingly, the expense is not proven to be a proper offset in determining Plaintiff's damage recovery in tort against Rafalian.  The $4,000,000 expense is not relevant to Plaintiff's potential election of monetary damages even though it may be relevant to the obligations of the LP and may impact the value of Plaintiff's interest in the LP if he elects to claim that interest in the forthcoming judgment herein instead of claiming monetary damages."[17]

---

[17] Trial exhibit 157 is the June 26, 2018 agreement between the Trustee and Levy, in which the Trust acknowledged "that Shaoul Levy and his affiliates have provided material value to

The trial court concluded, "Plaintiff is entitled to monetary damages in the amount of (50,870,000 - 10,211,869.69) /2 = 20,329,065.20. Should Plaintiff elect, the Court will enter judgment in Plaintiff's favor in the amount of $20,329,065.20."

H.    *The Judgment*

On July 11, 2022 the Trustee filed a notice of election of the monetary award. On August 5, 2022 the trial court entered judgment in favor of the Trustee in his action against Rafalian and in favor of defendants, including Ely and Samih, in Rafalian's consolidated action. The judgment provided, "1. Plaintiff, in his capacity as Trustee of the Trust, shall have and recover from Rafalian the sum of $20,329,065.20, plus prejudgment interest from February 15, 2022, the trial date, through the date of entry of judgment accruing at the statutory daily rate of $5,569.60 in the amount of $857,718.40, on all causes of action stated in Plaintiff's complaint. [¶] 2. Rafalian's Cross-Complaint is dismissed with prejudice. [¶] 3. Rafalian shall take nothing from Plaintiff on Plaintiff's complaint and from Plaintiff and the Consolidated Defendants on Rafalian's Consolidated Complaint."

---

the Company, and the Property, and agrees that when the project is sold or refinanced, the highest priority payment after secured debt will be any advance made by Shaoul Levy or any of his affiliates, plus 20% per annum. Second priority is a payment of $4,000,000 to Shaoul Levy or assignee, for the financing, construction, leasing and personal recourse guarantees provided for the benefit of the Property."

17

I.      *Rafalian's Motion for New Trial*

On August 18, 2022 Rafalian moved for a new trial under section 657. Rafalian argued the monetary damages awarded to the Trustee by the judgment were excessive and should be corrected because they were contrary to the undisputed trial evidence. Rafalian claimed the maximum monetary damages should have been $7,128,051 and not the $20,329,065 awarded in the judgment. Rafalian explained, "$50,870,000 (the appraised value of Carson Real Property) minus $26,250,000 (the current outstanding amount of the [Wells Fargo Bank] Permanent Loan) minus $3,072,000 (the unpaid balance of consulting fees owing to Mr. Levy) divided by 2, minus $1,737,000 (Mr. Rafalian's 2004 initial investment), minus $1,908,949.25 (accrued interest on Mr. Rafalian's investment at 6% per annum from 2004 to August 29, 2022) equals $7,128,050.75, plus post-judgment per diem interest of $1,954.50 computed at 10% per annum from the date of entry of the corrected judgment." Rafalian also argued the Trustee was not entitled to recover prejudgment interest from the trial commencement date because the damages amount was not certain. Rather, the Trustee's damages were contingent on the trial court's factual findings after trial and the Trustee's election of the monetary award.

In his supporting declaration, Levy attached numerous business records from the LP and LLC. Levy declared the business records confirmed his trial testimony "with respect to the actual uses and application of all the proceeds" of the $21,575,000 construction loan from Western Alliance Bank and the $26,250,000 permanent loan with Wells Fargo Bank. Levy stated the construction loan was used to pay off the prior loan and defeasance fee ($10,211,870) and origination charges.

Western Alliance Bank retained the remainder ($10,889,747) to pay interest on the loan and as a construction holdback, whereby the bank disbursed payments directly to the contractors for reconstruction of the Carson Property.  To cover the additional construction costs incurred by the LP, Rafalian loaned $1,200,000, limited partner Jacob Levy loaned $400,000, and 1000 Claudia Court, LLC (Jacob Levy's business) loaned $1,268,000.  In 2019 Shaoul Levy obtained a permanent loan from Wells Fargo Bank for $26,250,000, which was payable with interest only, and secured by a recorded deed of trust against the Carson Property.  The Wells Fargo Bank loan, along with the LP's $50,000 deposit into escrow (in total $26,300,000), were used to pay off the loan origination charges ($767,683); the Western Alliance Bank construction loan ($21,657,531); the $400,000 loan from Jacob Levy; and the $1,268,000 loan from 1000 Claudia Court, LLC.  The LP's net proceeds of $2,206,786 were then used to pay Shaoul Levy's $1,040,950 loan to the LP, his consulting fees ($37,733 and $928,000), and the legal fees for financing ($22,088).  After these disbursements, the LP had $178,015 left for its operations.

On October 18, 2022 the trial court[18] granted in part and denied in part the motion for new trial.  The court rejected Rafalian's argument that Levy's trial testimony and evidence regarding the LP's use of the loan proceeds from Wells Fargo Bank should be accepted as uncontradicted.  The court added, "The Court considered the evidence of the $26,250,000.00 refinancing with Wells Fargo Bank, and the Court noted that some of the increased encumbrance was used for tenant

---

[18]     Judge Thomas D. Long.

improvements. (Statement of Decision at p. 15.) However, the Court also noted that 'the specific amounts so used and their reasonableness remain unproven.' (*Ibid*.) Defendant did not meet his burden of proving the reasonableness of this offset at trial."

Likewise, the court found that at trial Rafalian failed to satisfy his burden to prove the entire $21,575,000 loan from Western Alliance Bank should be deducted from the damages award. The court also found the evidence presented in support of the motion was not newly discovered evidence, and Rafalian failed to show he could not have produced the evidence at trial. The court concluded, "Based on that evidence and reasonable inferences therefrom, the Court is not convinced that it should have reached a different decision."

The trial court also rejected Rafalian's argument that he was entitled to a credit of $3,072,000, the unpaid balance of the service fee owed to Levy. The court explained, "The court considered Defendant's argument at trial and found that the consulting fee pledged to Levy was not a proper offset for Plaintiff's damages against Defendant. (Statement of Decision at p. 15.) The Court found that there was 'no evidence in the record establishing the reasonableness of these expenses to the satisfaction of the Court.' (*Id*. at pp. 15-16.) The Court also noted that the agreement was between Plaintiff and Levy as to how the obligations of the LP would be addressed if and when Plaintiff obtained an interest in the LP, the agreement did not include Defendant as a party, and Defendant did not appear to be a third-party beneficiary. (*Id*. at p. 16.) This evidence was considered at trial, and Defendant failed to meet his burden of proving that it was a reasonable deduction to which he was

20

entitled. Based on the evidence presented at trial and reasonable inferences therefrom, the Court is not convinced that it should have reached a different decision."

The trial court further found Rafalian's initial capital investment of $1,737,000, which was used by the LP to purchase the Carson Property, was not a deduction to the damages award. The court reasoned, "A deduction based on a payment (and its associated six percent interest) made prior to the November 6, 2006 judgment would be a recalculation of that property interest. Plaintiff has a previously established right to fifty percent of the ownership interest even after considering an initial capital investment, and any deductions are proper only for amounts proven after the November 6, 2006 judgment and division of ownership."

However, the trial court agreed with Rafalian that the Trustee was not entitled to prejudgment interest from February 15, 2022, the first day of trial. However, "as of March 4, the last trial date, all evidence had been presented. Plaintiff's damages were capable of being made certain by calculation, even if the Court has not yet issued its calculations in the form of the final Statement of Decision. And although Plaintiff did not elect his remedy of monetary damages until July 11, 2022, that amount of damages was capable of being made certain by calculation and Plaintiff had a vested right to recover the damages by the close of trial." The court concluded, "The motion is granted in part. The Court will modify the judgment to award prejudgment interest only from the March 4, 2022 close of trial through the August 5, 2022 entry of judgment. (See Code Civ. Pro., § 662.)"

Rafalian timely appealed.

# DISCUSSION

A. *Rafalian Lacked Standing To Challenge the Formation and Validity of the Trust*

During the trial, the court rejected Rafalian's effort to present evidence showing the Trust was illegal, explaining Rafalian lacked standing, the defense was barred by the statute of limitations, and even if the Trust was illegal, the Trustee could pursue the claims against Rafalian and, if he prevailed, administer a resulting trust instead of an express trust. The court found the Trust was valid, stating in its statement of decision that "the Shamsam Irrevocable Trust (the 'Trust') [was] a trust that was duly formed under the laws of the State of California pursuant to a written trust instrument."

Rafalian contends the trial court erred in entering judgment for the Trust because the Trustee failed to present evidence at trial of a valid trust, including the terms of the trust and its formation. He also argues the Trust had an unlawful purpose—to defraud Ely's creditors—and the court abused its discretion in preventing Rafalian from introducing evidence to support his contention, which he raised in his affirmative defenses. Rafalian's challenges fail because he does not have standing to assert the invalidity or illegal purpose of the Trust.

"'To have standing, a party must be beneficially interested in the controversy, and have "some special interest to be served or some particular right to be preserved or protected.' [Citation.] This interest must be concrete and actual, and must not be conjectural or hypothetical.'" (*Limon v. Circle K Stores, Inc.* (2022) 84 Cal.App.5th 671, 699; accord, *MTC Financial Inc. v. California Dept. of Tax & Fee Administration* (2019)

22

41 Cal.App.5th 742, 747.) "[O]nly 'interested person[s]' have legal standing to contest the provisions of a will or trust." (*Schwan v. Permann* (2018) 28 Cal.App.5th 678, 698.) Probate Code section 48, subdivision (a)(1), defines "'interested person'" as "[a]n heir, devisee, child, spouse, creditor, beneficiary, and any other person having a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding." (See *Barefoot v. Jennings* (2020) 8 Cal.5th 822, 827-828 [holding former beneficiaries had standing to challenge trust amendments based on incompetence, undue influence, or fraud, but stressing that "[o]ur holding does not allow individuals with no interest in the trust to bring a claim against the trust"].)[19]

Because Rafalian is not an heir, devisee, child, spouse, creditor, beneficiary, or a person having a property right in or claim against the Trust, he does not have standing to challenge its formation or validity.[20] Moreover, the trial court did not err in

---

[19] Rafalian's reliance on *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919 is misplaced. In *Yvanova*, the Supreme Court held, "[A] wrongful foreclosure plaintiff has standing to claim the foreclosing entity's purported authority to order a trustee's sale was based on a void assignment of the note and deed of trust." (*Id.* at p. 939.) The Supreme Court explained, "The foreclosed-upon borrower clearly meets the general standard for standing to sue by showing an invasion of his or her legally protected interests [citation]—the borrower has lost ownership to the home in an allegedly illegal trustee's sale." (*Ibid.*) Unlike a foreclosed-upon borrower who has an interest in the validity of a trustee's sale, Rafalian has no interest in the Trust.

[20] Rafalian became a judgment creditor of Ely when he acquired by assignment two judgments against Ely: the Goldman judgment and a March 11, 2011 judgment in *International*

---

excluding evidence of the alleged illegality of the Trust because, in light of Rafalian's lack of standing, evidence of the illegal purpose was not relevant to the Trustee's action. (See Evid. Code, § 210 ["'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].[21]

## B.   *The Trustee Had Standing To Enforce the 2006 Judgment*

In the 2012 Assignment of the 2006 Judgment, Ely assigned to the Trustee "his entire right, title and interest in the judgment on Ely's sixth cause of action for declaratory relief," including the grant of Ely's "50% ownership interest in the Carson Property," Ely's right to have Rafalian act as "the

---

*Fidelity Insurance Company v. Elyaszadeh* (Super. Ct. L.A. County, 2008, No. BC402486). But on September 23, 2020 Rafalian's attorney signed acknowledgements of full satisfaction of both judgments, which were admitted as trial exhibits. Thus, Rafalian was no longer a judgment creditor of Ely at the time of trial.

[21]   Because the trial court did not abuse its discretion in excluding the proffered evidence based on Rafalian's lack of standing to challenge the validity of the Trust, we do not decide (1) whether Rafalian can assert as an affirmative defense that the Trust was created for the improper purpose of facilitating a fraudulent conveyance; (2) whether the statute of limitations barred Rafalian's affirmative defense based on the Trust's illegality; and (3) assuming the Trust was invalid and became a resulting trust, whether Magasinn, as the resulting trustee, could still maintain the action and convey the 50 percent interest in the Carson Property to Ely.

24

constructive trustee of Ely's 50% ownership interest in the Carson Property," and the duty to protect Ely's interest in the Carson Property and to deliver the interest to Ely "as soon as possible." Rafalian contends the Assignment was never admitted into evidence and the Trustee had no standing to enforce the 2006 Judgment.

Contrary to Rafalian's assertion that the Assignment (trial exhibit 3) was never admitted into evidence, the trial court took judicial notice of the Assignment at trial. The court reaffirmed in its statement of decision that it had admitted the Assignment into evidence, explaining, "Despite the admission of Exhibit 3 into evidence clearly documenting the assignment of the Judgment to the Trust, Rafalian argues, for the first time in objections to the Court's Tentative Statement of Decision, that there is no evidence of assignment, and that Plaintiff therefore lacks standing and judgment should be entered for Rafalian. At trial Rafalian argued that the assignment was made to hide assets from Ely's creditors. Rafalian's new argument that the Judgment was not assigned is clearly contrived."

The Assignment gave the Trustee standing to pursue Ely's claims based on the 2006 Judgment. Section 680.240 defines "'judgment creditor'" to include "the person in whose favor a judgment is rendered" or "an assignee of record." Section 681.020 provides as to enforcement of a judgment that "[a]n assignee of a judgment is not entitled to enforce the judgment under this title unless an acknowledgment of assignment of judgment to that assignee has been filed or the assignee has otherwise become an assignee of record under Section 673." And section 673, subdivision (a), in turn, provides that an assignee "may become an assignee of record

25

by filing with the clerk of the court which entered the judgment an acknowledgment of assignment of judgment." Sections 681.020 and 673 together "specify requirements for an assignee to obtain standing as a judgment creditor to enforce a judgment under the Enforcement of Judgments Law." (*California Coastal Com. v. Allen* (2008) 167 Cal.App.4th 322, 327.)

Here, the trustee became an assignee of record pursuant to sections 681.020 and 673 when Ely filed in the *Haeim* action an acknowledgement of assignment of judgment in conformity with the requirements of section 673.  Rafalian does not contend the Assignment did not meet the statutory requirements.  And, as the Court of Appeal in *California Coastal Com. v. Allen, supra*, 167 Cal.App.4th at page 327 explained, "No provision is made for a debtor to attack the judgment creditor's authority to make the assignment; the scope of the provision is limited to the process for an assignee to obtain standing to proceed as a creditor.  For this reason, we conclude the Legislature did not intend a proceeding under the Enforcement of Judgments Law to become a forum for litigating the validity of the underlying assignment agreement." Accordingly, as the assignee of record, the Trustee had standing as a judgment creditor to enforce Ely's right, title, and interest in the 2006 Judgment with respect to Ely's sixth cause of action in the *Haeim* action.

C.  *The Assignment of Ely's Interest in the Sixth Cause of*
    *Action of the 2006 Judgment, Even if a Partial Assignment,*
    *Allowed the Trustee To Enforce Ely's Right to a 50 Percent*
    *Interest in the Carson Property Under the 2006 Judgment*

Rafalian contends Ely's assignment to the Trustee of Ely's rights and interest under the 2006 Judgment with respect to Ely's sixth cause of action for declaratory relief constituted an unenforceable partial assignment of Rafalian's debt because the 2006 Judgment included judgment on the fifth cause of action (for Ely to have access to the books and records regarding the Carson Property and a full accounting) and the sixth cause of action for declaratory relief (that Ely held a 50 percent ownership interest in the Carson Property).  Even assuming, without deciding, that the Assignment was a partial assignment of the 2006 Judgment, Rafalian's contention lacks merit.

Rafalian relies on *Buckeye Refining Co. v. Kelly* (1912) 163 Cal. 8 to support his contention a partial assignment is unenforceable absent the consent of the debtor (which Rafalian did not give).  In *Buckeye Refining Co.*, at pages 12 to 13, the Supreme Court held, "An assignment of a portion of a judgment, according to most of the authorities, has no effect against the judgment debtor unless made with his consent or ratified by him. [Citations.]  This is in accord with the general rule governing partial assignments of choses in action.  The creditor cannot split his demand, and by assignment of a portion thereof impose upon the debtor the legal obligation of paying the assignee."  (See *Gause v. Pacific Gas & Electric Co.* (1923) 60 Cal.App. 360, 371 ["the rule at law is that 'a partial assignee has no legal standing to enforce a partial assignment against a debtor who has not consented thereto'"].)

27

However, 10 years after *Buckeye Refining Co.*, the Supreme Court clarified in *Martin v. Howe* (1922) 190 Cal. 187, 191-192, ""'"As a general rule, a single cause of action or claim arising out of an entire contract cannot without the debtor's consent be split up by means of partial assignments, so as to become the subject of different actions; but as in other cases this may be done with the debtor's consent, and even without his consent a partial assignment may be enforced in equity if the other persons interested are brought in as parties to the suit."'"" (Accord, *Taylor v. Sanford* (1962) 203 Cal.App.2d 330, 347 ["'a partial assignment may be enforced in equity if the other persons interested are brought in as parties to the suit'"].)  As the Court of Appeal explained in *Cain v. State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 794-795, "At common law, a partial assignee had no legal standing to sue; the underlying rationale was that the original creditor could not split his cause of action and sue the debtor in two actions, and he could not bring about the same result by assigning part of the claim to another and subjecting the debtor to two suits by different plaintiffs.  Enforcement of a partial assignment of a claim was permitted in equity, however, by the process of requiring joinder of all interested parties; i.e., the assignor and all partial assignees.  [Citation.]  '. . . [U]nder the codes, which have merged legal and equitable actions and adopted the equity procedure of joinder, there is no longer any procedural obstacle to enforcement of the partial assignment. The plaintiff partial assignee may sue by joining the partial assignor.'"

Here, there is no procedural obstacle to the Trustee's enforcement of his rights under the 2006 Judgment as to Ely's sixth cause of action because Ely was a party at trial.  Although

28

the Trustee did not join Ely as a party when he sued Rafalian, Ely became a party when Rafalian named Ely as a cross-defendant in the cross-complaint and a defendant in the consolidated action brought by Rafalian (*Rafalian v. Elyaszadeh* (Super. Ct. L.A. County, 2019, No. 19STCV06801). In *Martin v. Howe, supra*, 190 Cal. at pages 194 to 195 the Supreme Court rejected the argument that the appellant, who sued to recover his 44 percent interest due under a promissory note, "'never properly joined'" the two other noteholders. The other two noteholders "in their answer denied they had been requested to join as plaintiffs" and argued "that the evidence showed clearly that they had not been requested and never refused to so join." (*Id.* at p. 195.) The Supreme Court reasoned, "As far as the respondents other than [the two noteholders] are concerned, it is sufficient if the two latter respondents are made parties in some capacity, so that their rights may be determined in this action." (*Ibid.*) Because the Trustee and Ely were parties, there is no concern that Rafalian would be subject to two separate actions to enforce the 2006 Judgment.

Further, with respect to Ely's fifth cause of action under the 2006 Judgment, Ely was entitled to a full accounting of all income and expenses and an annual accounting of the Carson Property "*until such time* as the Carson Property is sold and/or Ely receives his 50% ownership interest or a distribution representing same." (Italics added.) The August 2022 judgment, which awarded the Trustee $20,329,065 as a distribution of Ely's 50 percent ownership interest in the Carson Property, therefore extinguished Ely's right under the 2006 Judgment as to his fifth cause of action.

29

D.       *The Evidence Rafalian Presented at Trial Does Not Compel the Conclusion the Monetary Award Was Excessive*

1.       *Governing law and standard of review*

"A claimant pursuing a cause of action for breach of fiduciary duties 'ha[s] the right to elect the kind of relief they seek.' [Citation.]  The available relief includes damages or any of a "'variety of equitable remedies,'" including disgorgement of profits." (*Center for Healthcare Education & Research, Inc. v. International Congress for Joint Reconstruction, Inc.* (2020) 57 Cal.App.5th 1108, 1125 (*Center for Healthcare Education*); accord, *Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 396 (*Meister*) ["'Where a breach of fiduciary duty occurs, a variety of equitable remedies are available, including imposition of a constructive trust, rescission, and restitution, as well as incidental damages.'"].)  "In measuring the amount of the defendant's unjust enrichment, the plaintiff may present evidence of the total or gross amount of the benefit, or a reasonable approximation thereof, and then the defendant may present evidence of costs, expenses, and other deductions to show the actual or net benefit the defendant received." (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1487; accord, *Meister*, at p. 399.)

"[W]here an aggrieved principal seeks disgorgement as a remedy for a breach of fiduciary duties, '"[t]he party seeking disgorgement 'has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain . . . .'"'" (*Center for Healthcare Education, supra*, 57 Cal.App.5th at pp. 1126-1127; accord, *Meister, supra*, 230 Cal.App.4th at p. 399.)  "The burden then shifts to the fiduciary to 'present evidence of costs, expenses, and other

30

deductions to show the actual or net benefit the [fiduciary] received."' (*Center for Healthcare Education*, *supra*, 57 Cal.App.5th at p. 1127; accord, *Meister*, at p. 399.)

"'"When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals, it is somewhat misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. . . . Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"'" (*Center for Healthcare Education, supra*, 57 Cal.App.5th at pp. 1124-1125; accord, *Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978-979; *Meister, supra*, 230 Cal.App.4th at p. 395.)

"'[W]here . . . the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor.'" (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734; accord, *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.) "That is because unless the trial court makes specific findings of fact in favor of the losing [party], we presume the trial court found the [losing party's] evidence lacks sufficient weight and credibility to carry the burden of proof. [Citations.] We have no power on appeal to judge the credibility of witnesses or to reweigh the

31

evidence." (*Bookout*, at p. 1486; accord, *Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 579.)

> 2. *Rafalian fails to show the trial evidence compels the conclusion that the monetary award was excessive*

Rafalian contends the monetary award ($20,329,065) was excessive because it failed to include all the deductions to the $50,870,000 value of the Carson Property. Rafalian argues he was entitled to deduct his capital contribution of $1,737,000, as well as interest on his contribution. Rafalian points to Levy's testimony that Levy had an agreement with Rafalian that Rafalian would get either a 6 or 8 percent rate of return on his investment in the LP.[22] Rafalian asserts he is entitled to $1,832,416, which he determined by applying a 5.95 percent simple interest rate on his $1,737,00 capital contribution, calculating interest from the purchase date of the Carson Property in 2004 to August 29, 2022, the date of his brief in support of his motion for new trial. But as the trial court found in denying Rafalian's motion for new trial, a deduction based on Rafalian's 2004 capital contribution (and 6 percent in interest) made prior to the November 6, 2006 judgment would be an improper recalculation of the 50 percent property interest awarded to Ely in the 2006 Judgment.

Rafalian also argues the trial court should have deducted Levy's unpaid service fee of $3,072,000 ($4 million less the $928,000 Levy had already received) from the appraised value of the Carson Property. In the statement of decision, the court

---

[22] Levy testified he did not know if there was an agreement between Ely and Rafalian as to the interest each would receive as a return for their investment in the LP.

considered Levy's $4 million fee and found "there is no evidence in the record establishing the reasonableness of these expenses to the satisfaction of the [c]ourt." Rafalian contends the trial court disregarded Levy's uncontradicted testimony that Ely agreed to Levy's $4 million service fee and the Trustee's admission that Levy was entitled to $4 million in the Trustee's June 2018 agreement with Levy (trial exhibit 157). The court acknowledged the Trustee and Levy had an agreement "as to how the obligations of the LP will be addressed if and when Plaintiff obtains an interest in the LP." But the court found, "The agreement does not include Rafalian as a party, nor does he appear to be a third-party beneficiary to the agreement. Accordingly, the expense is not proven to be a proper offset in determining [the Trustee's] damage recovery in tort against Rafalian." Moreover, Rafalian testified he did not agree to pay Levy a service fee of $4 million. Levy's testimony and the June 2018 agreement between the Trustee and Levy do not compel the conclusion that Rafalian is entitled to a deduction for Levy's fee given the lack of evidence the fee was reasonable.

Rafalian also argues the trial court erred in failing to deduct the $26,250,000 Wells Fargo Bank loan from the value of the Carson Property. In its statement of decision, the trial court acknowledged the 2017 construction loan from Western Alliance Bank was used to pay off the prior loan and defeasance fee ($10,211,870). The court also found the balance of the refinancing of the $21,575,000 construction loan funded the redevelopment of the Carson Property that allowed the owners to replace Kmart as a tenant and helped restore the Carson Property's value. But, as discussed, the court found "the specific amounts of the 2017 refinancing used for these purposes and

33

their reasonableness has not been proven," and the 2019 Wells Fargo Bank loan for $26,250,000 was likewise used for tenant improvements, "but the specific amounts so used and their reasonableness remain unproven."

Rafalian asserts Levy's uncontradicted trial testimony showed that the 2017 construction loan from Western Alliance Bank was used to pay off the prior loan and the defeasance fee and to fund renovation of the Carson Property. Levy also testified the 2019 Wells Fargo Bank loan was used to refinance the construction loan and to pay Levy a portion of his $4 million fee. Although the trial court found that the loans were used to fund redevelopment of the Carson Property, it concluded Rafalian failed to prove the specific amounts and reasonableness of the tenant improvement costs. Indeed, it was not until Rafalian filed his motion for new trial that he presented business records from the LP and LLC showing how the two bank loans were used to pay off the prior loans, interest on the loans, and amounts owed to contractors for the redevelopment of the Carson Property.

The court was not required to accept the conclusory testimony of Levy that the full amount of the two bank loans was used to repay the prior loan and defeasance fee and to pay contractors on the redevelopment project (as opposed to giving the money to Rafalian). Indeed, the entirety of Levy's testimony on how the 2017 construction loan was used was as follows:
"Q:     This loan amount of $21,575,000, you said part of it went to pay off the loan, existing loan, right?
"A:     Yes.
"Q:     Part of it went to pay off the defeasance fee?
"A:     Yes.
"Q:     Part of it went to tenant improvements?

34

"A:     Yes and more.

"Q:     So aside from those three uses, there were no other recipients of the proceeds of the Western Alliance Bank loan; is that correct?"  [¶] . . . [¶]

"A:     Let me make it clear,  Mr. Rafalian did not take any money from this property.  He doesn't even have signatory I don't believe.  I don't think he ever signed a check.  No money at all went to Mr. Rafalian, zero, zip."

Levy's testimony alone, without additional detail or supporting documentation, does not compel the conclusion that the loan amounts should have been deducted from the appraised value in calculating the monetary award.

E.     *The Trial Court Did Not Abuse Its Discretion in Denying Rafalian's Motion for a New Trial*

1.     *Governing law and standard of review*

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute.  [Citation.] Section 657 sets out seven grounds for such a motion: (1) 'Irregularity in the proceedings'; (2) 'Misconduct of the jury'; (3) 'Accident or surprise'; (4) 'Newly discovered evidence'; (5) 'Excessive or inadequate damages'; (6) 'Insufficiency of the evidence'; and (7) 'Error in law.'" (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633; accord, *Jackson v. Park* (2021) 66 Cal.App.5th 1196, 1213.)

"When a motion for new trial is based on the ground of excessive damages, the trial court is restricted to the evidence presented at trial.  'A new trial shall not be granted . . . upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record,

including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision.'" (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1660-1661; accord, *Ena North Beach, Inc. v. 524 Union Street* (2019) 43 Cal.App.5th 195, 210, fn. 33; see § 657 ["A new trial shall not be granted . . . upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."].)  "The amount of damages to be awarded is a question of fact committed, first to the discretion of the trier of fact, and then to the discretion of the trial court on a motion for new trial."  (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 490; accord, *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506.)

"When the trial court provides a statement of reasons as required by section 657, the appropriate standard of judicial review is one that defers to the trial court's resolution of conflicts in the evidence and inquires only whether the court's decision was an abuse of discretion."  (*Oakland Raiders v. National Football League, supra*, 41 Cal.4th at p. 636; accord, *LA Investments, LCC v. Spix* (2022) 75 Cal.App.5th 1044, 1063 ["The appellate court ordinarily defers to the trial court's denial of a motion for new trial based on excessive damages, because of the trial judge's greater familiarity with the case."].)

2.      *The trial court did not abuse its discretion*

In support of his motion for new trial, Rafalian submitted a declaration from Levy in which Levy provided business records that supported his trial testimony regarding the LP's use of the 2017 construction loan and 2019 Wells Fargo Bank loan.

36

Rafalian does not contend the business records were newly discovered evidence.  Rather, he argues the additional evidence was offered because the trial court disregarded Levy's uncontroverted testimony that (1) the 2017 construction loan was used solely to pay off the prior loan, the defeasance fee, and tenant improvement costs, and (2) the 2019 Wells Fargo Bank loan was used to pay off the construction loan and a portion of his $4 million service fee.

While Levy's declaration and the attached business records could arguably have supported Rafalian's entitlement to a deduction for the $26,250,000 Wells Fargo Bank loan, which was used to pay off the construction loan and debt owed to Jacob Levy and Shaoul Levy for redevelopment of the Carson Property, Rafalian failed to present this evidence at trial.  Section 657 prohibits the trial court from granting a new trial based on excessive damages "unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."  Because the court was limited to the evidence at trial, and it found as the trier of fact that Levy's trial testimony was "conclusory," the court did not abuse its discretion by denying Rafalian's motion for new trial based on excessive damages.

F.   *The Trial Court Erred in Awarding Prejudgment Interest From the Close of Trial*

Rafalian contends the trial court erred in awarding the Trustee prejudgment interest from March 4, 2022 (the close of trial) through the August 5, 2022 entry of judgment.  Rafalian's contention has merit.

Civil Code "[s]ection 3287, subdivision (a), allows a person to recover prejudgment interest on 'damages certain, or capable of being made certain by calculation[,]' *from the day* such damages are certain or capable of being made certain. '[T]he court has no discretion, but must award prejudgment interest upon request, from the day there exists both a breach and a liquidated claim.' [Citation.] Prejudgment interest is an element of damages, not a cost." (*Warren v. Kia Motors America, Inc.* (2018) 30 Cal.App.5th 24, 43; accord, *Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1314-1315 (*Glassman*).) A plaintiff who is awarded monetary damages for a defendant's breach of fiduciary duty is entitled to recover prejudgment interest under Civil Code section 3287, subdivision (a), if "'[d]amages are deemed certain or capable of being made certain.'"[23] *(Leff v. Gunter* (1983) 33 Cal.3d 508, 519-520; see *Glassman,* at pp. 1318-1319 ["""the key distinguishing factor"" for determining section 3287(a)'s application is not . . . ""whether the cause of action arose in tort or contract, but rather whether the damages [are] readily ascertainable"""].)

---

[23] The Trustee, Ely, and Samih contend the trial court did not abuse its discretion in awarding prejudgment interest under Civil Code section 3287, subdivision (b). But Civil Code section 3287, subdivision (b), is inapplicable because the Trustee was awarded damages for his breach of fiduciary duty and conversion claims, and not for "damages based upon a cause of action in contract." (See Civ. Code, § 3287, subd. (b) ["Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."].)

"'Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of the statute if the defendant actually knows the amount of damages or could calculate the amount from information reasonably available to the defendant.  [Citation.]  . . .  A legal dispute concerning the defendant's liability or the proper measure of damages, however, does not render damages unascertainable. [Citations.]  [¶]  Thus, the general rule is that damages are unascertainable if the amount of damages depends on disputed facts or the available factual information is insufficient to determine the amount; and damages are ascertainable if the only impediment to the determination of the amount is a legal dispute concerning liability or the measure of damages.'" (*Cheema v. L.S. Trucking, Inc.* (2019) 39 Cal.App.5th 1142, 1151; accord, *Olson v. Cory* (1983) 35 Cal.3d 390, 402 ["Generally, the certainty required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability."]; *Glassman, supra*, 90 Cal.App.5th at p. 1317.)

"""'On appeal, we independently determine whether damages were ascertainable for purposes of [section 3287(a)], absent a factual dispute as to what information was known or available to the defendant at the time[.]'"""' (*Glassman, supra*, 90 Cal.App.5th at pp. 1321-1322; accord, *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1038.)

At the end of trial on March 4, 2022, the trial court stated that it would tentatively award either a 50 percent interest in the LP and LLC or a monetary award to the Trustee.  The court explained, "[T]he value of the property will be determined, and I'm not fully sure on how it will be determined, but the value of

39

the property will be determined by taking the appraised value with any adjustments I think are appropriate, the appraised value minus whatever deductions I conclude are appropriate." At the April 29, 2022 hearing, the Trustee's attorney argued "the only proper deduction from [the] value [was] the $7.9 million" from the construction loan that was used to pay off the prior loan. After additional argument from the attorneys, the court stated, "I think there is substantially greater offsets that would make sense to me if they're somewhere in the record as to what their amounts were. That would include the defeasement fees, the tenant improvements that were necessary to revamp the property from the loss of Kmart. I think if those could be proven as to specific amounts rather than just vague generalities, I think they would be appropriate offsets. Right now the status of the record as I understand it—and I'm happy to have the parties educate me and that's why this will be a tentative statement of decision—is the only offset I think that is proven is the $7,984,607.44. What I get as a result of that is I take $50,870,000, I subtract $7,984,607.44, divide by 2. And I get . . . $21,442,696.30 as being the proper amount of monetary damages."

It was not until the trial court issued its June 17, 2022 statement of decision that it determined the amount of the damages award was $20,329,065. The court calculated the award by subtracting the prior loan payoff and defeasance fee ($10,211,869) from the appraised value of the Carson Property ($50,870,000) and dividing the difference by two. Because the deductions to the value of the Carson Property were disputed facts that the trial court did not resolve until it issued the final statement of decision, the damages were not ascertainable or capable of being made certain by calculation prior to June 17,

2022.  Thus, the court erred in granting prejudgment interest starting from March 4, 2022, the last day of trial.  Rather, the Trustee is entitled to prejudgment interest from June 17, 2022 through the August 5, 2022 entry of judgment.  (*Warren v. Kia Motors America, Inc., supra*, 30 Cal.App.5th at p. 44 ["""""The statute . . . does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, 'depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor.""""""]; cf. *Leff v. Gunter, supra*, 33 Cal.3d at p. 520 ["[O]nce plaintiff's entitlement to damages for defendants' breach of fiduciary duty was established, the amount of those damages was calculable—and, apparently, actually calculated—mechanically, on the basis of uncontested and conceded evidence of the value of the IRS Center upon its completion, the balance due on the indebtedness to which it was subject, and the extent of plaintiff's interest in the original joint venture."].)[24]

---

[24]  On July 1, 2024, one day before oral argument in this appeal, Magasinn moved to dismiss the appeal under the disentitlement doctrine.  "The disentitlement doctrine 'is a discretionary tool that may be used to dismiss an appeal when the balance of the equitable concerns makes dismissal an appropriate sanction.  [Citation.]  The rationale underlying the doctrine is that a party to an action cannot seek the aid and assistance of an appellate court while standing in an attitude of contempt to the legal orders and processes of the courts of this state.  [Citation.]  No formal judgment of contempt is required under the doctrine of disentitlement.  [Citation.]  An appellate court may dismiss an appeal where the appellant has willfully disobeyed the lower court's orders or engaged in obstructive

41

tactics.'" (*Menezes v. McDaniel* (2019) 44 Cal.App.5th 340, 346; accord, *In re Marriage of Cohen* (2023) 89 Cal.App.5th 574, 580-581.)

Magasinn contends dismissal of the appeal is warranted because Rafalian transferred his interest in real property in Los Angeles seven days before the August 5, 2022 judgment; Rafalian failed to fully respond to the October 14, 2022 discovery requests; Rafalian failed to attend his judgment debtor examination scheduled for December 6, 2022 or the rescheduled examination on February 24, 2023; and although he appeared for his June 9, 2023 judgment debtor examination, Rafalian failed to produce documents and refused to answer many questions about his assets. Magasinn asserts that he filed the motion "at the earliest possible opportunity" because the contempt proceeding scheduled for June 28, 2024 was continued to August 2024. However, Rafalian's alleged conduct occurred in 2022 and 2023, and there is no reason Magasinn had to wait for the contempt proceeding to take place before filing his motion to dismiss. We therefore deny Magasinn's motion to dismiss as untimely.

## DISPOSITION

The judgment is reversed with respect to the award of prejudgment interest and otherwise affirmed.  On remand, the trial court shall determine the prejudgment interest from June 17, 2022 through August 5, 2022 and enter a new judgment consistent with this opinion.  The Trustee is to recover his costs on appeal.

FEUER, J.

We concur:

MARTINEZ, P. J.

STONE, J.

43